STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| In re: Woodstock Community Trust | } | |
| and Housing Vermont PRD[1] | } | Docket Nos. 126-6-07 Vtec (final) and |
| (Appeals of Roy, et al.) | } | 263-11-06 Vtec (preliminary) |
| | } | |

Decision and Order

In Docket No. 263-11-06 Vtec, Appellants David Roy, Richard Roy, Michael Hirschbuhl, Tod Minotti, and Mark Stanglin (Appellants) appealed from a decision of the Development Review Board (DRB) of the Town of Woodstock issued on November 3, 2006. The decision first granted reconsideration of the DRB's April 7, 2006 denial of an application submitted by Appellee-Applicants Woodstock Community Trust, Inc., and Housing Vermont for preliminary approval of a Planned Development located at 473 Woodstock Road, and then granted preliminary approval of that application. In Docket No. 126-6-07 Vtec, the same Appellants appealed from a decision of the DRB issued on June 4, 2007, granting final approval of the application. Appellants are represented by Kaveh S. Shahi, Esq.; Appellee-Applicants are represented by Daniel C. Hershenson, Esq.; and the Town of Woodstock is represented by Todd C. Steadman, Esq.

Two earlier appeals regarding this property have been concluded. The initial appeal was filed by Applicants from the DRB's initial denial of the application and

---

[1] Although originally proposed as a Planned Unit Development (PUD) with a community center in the former Grange building, the project as presented at trial is a Planned Residential Development (PRD) proposing only residential units, including three in the renovated former Grange building.

1

received Docket No. 99-5-06 Vtec; it was withdrawn when the DRB took up the reconsideration of its decision. The next appeal, brought by Appellants, was Docket No. 152-6-06 Vtec, which was remanded at the request of the DRB pursuant to V.R.E.C.P. 5(i).

Appellants objected to their having to identify the issues on appeal, despite the requirement in 10 V.S.A. § 8504(h) and V.R.E.C.P. 5(f) that the scope of the appeal is defined by the Appellants' Statement of Questions, and despite this Court's ruling on pretrial motions on October 3, 2007, that Appellee-Applicants would nevertheless have the burden of proof that the application met the requirements of the zoning ordinance. All questions in the Statement of Questions in Docket No. 263-11-06 Vtec except for Questions 9[2] and 10 were resolved by motion decisions dated October 3, 2007, May 10, 2007, and December 5, 2006. Questions 9 and 10 present the merits of the application for preliminary approval of the proposed project; these questions were consolidated with the merits of Docket No. 126-6-07 Vtec regarding final approval of the proposed project.

The restated Statement of Questions filed by Appellants in Docket No. 126-6-07 Vtec contained three questions, numbered as I, II, and III, of which Question I addressed the merits of whether the application met the requirements of §§ 709, 710, and 313 of the Zoning Regulations. Question I contained 19 subsections, some of which contained further subsections. Questions II and III were resolved in the Court's October

---

[2] Question 9 asked whether the DRB was correct to grant reconsideration and preliminary approval of the project, while Question 10 addressed whether this court in this de novo proceeding should grant preliminary approval. To the extent that Question 9 raised the same issues as Questions 4 and 8 regarding the propriety of reconsideration (as opposed to the merits), it was also resolved in the pretrial motion decisions.

3, 2007 motion decision, which also attached a redacted version of the Statement of Questions in Docket No. 126-6-07 Vtec memorializing those subsections of Question I agreed by the parties to remain in the appeal.[3] In a pretrial conference held on October 12, 2007, the redacted version of the Statement of Questions was confirmed. All references to the remaining question numbers in this decision are to the various subsections of Question I that remained in the appeal as of that pretrial conference.

An evidentiary hearing was held in this matter over the course of six days, before Merideth Wright, Environmental Judge. A site visit was taken before the hearing, with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Appellee-Applicants are two non-profit corporations, one local to Woodstock and one operating statewide, which propose an affordable housing development, having access from U.S. Route 4 in the village of West Woodstock, in a Residential Medium Density zoning district. Route 4 runs from the northeast to the southwest in this location. The project property is served by a municipal sewer system and by a municipal or community water system operated by the Woodstock Aqueduct Company. The entrance to the Woodstock middle school and high school complex is

---

[3] Question 13(b) refers to an introductory phrase in § 313(C)(3)(b) which requires the applicant to submit a plan "clearly showing the following: . . ." Each of the required elements of the plan is listed in a separate subsection, from (c) through (j). Each of these except subsection (f) was the subject of a separate subsection of Question 13; this decision therefore will not refer further to Question 13(b).

located about 550 feet farther to the southwest along Route 4 to the southwest, on the opposite side of Route 4.

The project is proposed for an 8.02-acre parcel of land consisting of two tax parcels: a half-acre parcel containing a former Grange building, with 70 feet of frontage on the northwest side of Route 4, and a 7½-acre vacant parcel of land, with 22.88 feet of frontage at the Route 4 end of the deeded access. These parcels are owned by Appellee-Applicant Woodstock Community Trust, Inc. As well as owning the two lots comprising the project property on the northwesterly side of Route 4, Appellee-Applicants have entered into a contract to purchase a one-acre parcel of land on the southeast side of Route 4, referred to as the Fox parcel, to be used in the proposed stormwater discharge system for the project.

The vacant parcel consists of a relatively flat field that has been used as a community playing field with associated parking; the parcel slopes beyond the field steeply upward towards the west and northwest. Much of the steeply sloping hillside is also wooded. Part of the way up the hill near the southwesterly side of the property is a wet area below an old wellhouse. Another frequently wet area is located near the middle of the northeasterly side of the property. No wetlands appear on relevant maps or have been delineated on the 8-acre project property.

Absent any alteration of the natural drainage due to the project, the natural drainage over the property is generally from its far western corner towards its eastern corner, and thence towards the Ottauquechee River. An existing culvert also drains across Route 4 onto or near the Fox parcel, from just to the southwest of the former Grange building.

Other than the former Grange parcel, the project property proposed for the housing units is located behind those of Appellants' properties which have access themselves directly onto Route 4. It appears that, despite the depiction of the separate

4

parcels with their dividing property line on all the plans, and the lack of setback lines on the former Grange parcel, Appellee-Applicants are treating the two parcels as having merged. If so, the merged property has 70 feet of frontage on Route 4 from the former Grange parcel, as well as having a deeded access to Route 4 between the Hirschbuhl and David Roy properties.

Appellee-Applicants refer to the project as now proposing thirty-six dwelling units in sixteen structures on an eight-acre parcel. The application states that the fifteen proposed new buildings include twelve duplex structures and three triplex structures, which totals thirty-three units, making thirty-six including the Grange building triplex.

However, some confusion has arisen because the project is also described as thirty-six dwelling units in fifteen new structures, plus the three units in the former Grange building, which appears to total thirty-nine units. This description occurs in several places in the application in evidence as Exhibit L, as well as in Appellee-Applicants' memorandum[4] in this appeal. Nevertheless, a close scrutiny of the project, including a count of the buildings proposed on Exhibits B and H (the most recently revised plan sheets), supports a count of thirty-six dwelling units in the proposal before the Court.

Although the project application describes the fifteen new buildings as having ten designs, the project plans now show seven different designs, labeled in each building's number as A through G. The Court was not provided with plans of the interiors of any of the proposed buildings, and was only provided (on Exhibit X) with

---

[4] "The development will consist of thirty-six dwelling units in fifteen separate structures, of which twelve will be duplex structures and three will be triplex structures on the 7.51 acre lot. An additional three dwelling units will be located in the renovated old Grange Hall located on the .51 acre lot." Appellee-Applicants' Proposed Findings of Fact & Concl. of Law at 3.

elevation drawings of buildings F and D. Building design F was labeled as a duplex; other testimony regarding Exhibit X discussed building design D as the redesigned triplex. The ten duplex units slated for sale are those labeled as buildings 5, 6, 7, 11 and 15, of building designs F and G.

There are also discrepancies between Appellee-Applicants' application, their witnesses' testimony at trial, and their post-trial memoranda, as to the size distribution of the proposed units. The application gives the size distribution of the units as ten 1-bedroom units, sixteen 2-bedroom units, and ten 3-bedroom units, but the distribution given in evidence at trial was nine 1-bedroom units, twenty-four 2-bedroom units (with "some potential" for conversion to 3-bedroom), and three 3-bedroom units. Appellee-Applicants' Proposed Findings of Fact and Conclusions of Law, at page 3, states yet a different size distribution of the units, as nine 1-bedroom units, sixteen 2-bedroom units, and eleven 3-bedroom units.

The project plans consist of sixteen sheets of project drawings. Although this is a de novo proceeding, Appellee-Applicants only provided sheets 1, 2, 7, and 8 of those project plans. In addition, Appellee-Applicants provided a colored version of a plan that contains elements of the site plan, landscaping plan, and lighting plan.

Access to the proposed project is proposed to be by a driveway running between the Hirschbuhl and the David Roy properties. The present traveled way of the existing gravel driveway is approximately 18 feet in width. The project plans show the deeded width of the access to be 22.88 feet at the outlet with Route 4, tapering to approximately 17½ feet wide (by scale) at the rear lines of the Hirschbuhl and Roy properties. Appellee-Applicants' plans show an additional 28 feet of right-of-way width along the side of the David Roy property. The project plans propose a two-way access driveway, measuring 22½ feet in width (by scale), or 22 feet in width as described in testimony, located partly within the deeded access width on the project property and partly within

6

the right-of-way on the Roy property. Additional landscaping and a sidewalk leading out to Route 4 is proposed within the deeded access adjacent to the Hirschbuhl property, as well as fencing surrounding the Hirschbuhl property.

The project is designed so that the developed area occupies the relatively flat areas on the project property, with buildings surrounding the outside of the loop road and set into the bottom of the sloped hillside. Within the area defined by the loop road, additional buildings surround a common area, which includes a fenced play area and a paved seating area. An additional road spur or parking lot extends from the loop road behind the Hirschbuhl residence to a dumpster and recycling enclosure on the Grange parcel behind the Grange building.

The Hirschbuhls and the Roys, among other plaintiffs, have filed a complaint (Roy, et al. v. Woodstock Community Trust, Inc., Docket No. 678-10-07 Wrcv[5]) in Windsor Superior Court regarding, among other claims, the parties' respective rights to the land lying under this proposed access to the property. The claims stated in that litigation include David Roy's claim to an approximately 18-foot-wide strip of the 28-foot-wide right-of-way, and Michael and Tonia Hirschbuhl's claim to an approximately 14-foot-wide strip of the deeded access (as well as to a 20-foot-wide strip along the back boundary of their property), as well as issues regarding the scope of the right-of-way. The success of both the Roy and the Hirschbuhl claims would leave the project with less than a twenty-foot-wide strip of land for the access road to the project.

The superior court lawsuit also addresses three claims regarding easements for water lines that pass through the property. One of these water lines, serving the

---

[5] As of the date of issuance of the present decision, the Windsor Superior Court case is scheduled to be trial-ready for a three- to four-day jury trial as of February 1, 2009, but has not yet conducted the mediation scheduled to be completed by October 1, 2008. No trial dates have been scheduled.

Burroughs residence to the northwest of the project property, is shown on the "Existing Conditions Site Plan" sheet of the plans (Exhibit A), as well as on the most recent "Proposed Storm Drain Plan" sheet of the plans (Exhibit H). It is shown on the plan as extending from the Burroughs property down the southwest side of the project property to a point approximately 280 feet by scale westerly of Route 4, but the water line's route across the remainder of the project property to its connection in the right-of-way of Route 4 is not shown on the project plans. The water line serving the Richard and Roberta Roy residence, while not shown on the "Existing Conditions Site Plan" (Exhibit A), is shown on the "Proposed Storm Drain Plan" (Exhibit H), as it passes onto the former Grange parcel to the southwest of the former Grange building, but its route across the remainder of the project property to its connection in the right-of-way of Route 4 also is not shown on the project plans. A third claimed easement, for water rights that would serve the Jay Smith property (located diagonally across the northeast corner of the project property), is not shown on any of the project plans and no evidence was presented that any pipes or spring tiles were ever installed pursuant to that claimed easement. It would be located, if at all, eight feet inside the northeasterly boundary of the project property, and therefore within the ten-foot-wide side setback area, which is shown as wooded and not proposed to be disturbed by the project as proposed.

Shortly before trial, the project's stormwater discharge system was redesigned to include a stormwater detention pond to be located on a one-acre parcel of land on the southeast side of Route 4 known as the Fox parcel. As of the time of trial, Appellee-Applicants held an option to purchase that parcel. The parcel contains a delineated Class III wetland and adjoins a small stream which is a tributary to the Ottauquechee River.

8

Appellants' Statement of Questions was not keyed to the specific subsections of the Zoning Regulations claimed to be at issue in this appeal, although the language of the questions can be traced to various subsections of §§ 313, 709 and 710 of the Zoning Regulations (Regulations). Similarly, the discussion of town plan sections below is limited to those sections of the Town Plans[6] raised in the parties' memoranda of law. The application was submitted for preliminary and for final approval as a Planned Residential Development, under § 313 of the Zoning Regulations pertaining to Planned Development, and also under the provisions of § 709 as to Site Plan Approval and § 710 as to Conditional Use Approval.

During trial and in their post-hearing memoranda, Appellee-Applicants suggested that approval of the project as a Planned Residential Development was not required, because the project proposal of thirty-six dwelling units on a total of eight acres of land does not exceed the overall density allowed by § 305(D)(1),[7] and the

---

[6] Appellants refer to two versions of the "Town & Village of Woodstock Comprehensive Plan" in their arguments: one which was adopted in 2001, and another which was adopted in 2007. These documents will be referred to as the 2001 Town Plan and the 2007 Town Plan. The 2001 Town Plan was in effect when the preliminary and final applications were considered by the DRB. The 2007 Town Plan was in effect at the time of trial and remains in effect.

[7] That section requires a minimum lot size of 8,000 square feet per "single or two-family dwelling," and a minimum of 16,000 square feet per "three-unit dwelling." If the lots are considered to have merged, the combined area of 349,350 square feet would allow a maximum of 43 duplex (or single-family) buildings, or 21 triplex buildings, or some combination of the two. If the lots are not considered to have merged, the Grange lot can only support the existing triplex Grange building (requiring disapproval of proposed Building 9 in its proposed location), while the larger lot of 327,135 square feet would allow a maximum 40 duplex (or single-family) buildings, or 20 triplex buildings, or some combination. These maximum numbers relate only to considerations of lot size, and not to whether such numbers could be approved on the steep slopes or with regard to compatibility with the surrounding area.

9

project complies with the other dimensional requirements of the Regulations.

However, § 305(D)(1) provides only the minimum required lot area; the term "lot" is defined in § 109 as a "single parcel of land" intended to be occupied by "one primary . . . building" and its accessory structures. Moreover, § 508 addresses the number of dwelling units per lot, rather than the number of buildings. Section 508 prohibits more than two dwelling units per lot, whether in separate buildings or attached as a duplex or triplex, except with conditional use approval of such "multi-housing." While the term "multi-housing" is not defined, the term "dwelling, multi-family" is defined in § 109 as "[a] <u>building</u> with more than two dwelling units" (emphasis added). Section 508 requires conditional use approval of multiple dwelling <u>units</u>; it does not provide for conditional use approval of multiple residential <u>buildings</u> on a single lot. The project requires approval as a Planned Residential Development under § 313, in order to allow multiple buildings to be clustered on the single eight-acre parcel of land.

The project is not proposed for subdivision, but instead intends the sale of ten of the units and the rental of the remaining twenty-six units. The underlying land will continue to be owned by the Woodstock Community Trust, Inc., which may qualify as a "non-profit organization organized for the purpose of providing housing in the Town of Woodstock," as defined in the definition of "affordable housing" in § 109. See also § 503. Appellee-Applicants intend to form some type of condominium or other type of planned community, with the ten privately-owned units forming one segment and the twenty-six rented units forming the other. Appellee-Applicants have not stated how many, if any, of the privately-owned units will be sold at an "affordable" rather than a "market" price, nor whether there will be any requirement for owner-occupancy of any of those units.

At trial, the vice-president for development of Housing Vermont testified that

the rental units would be "transferred to" the Twin Pines Housing Trust; it remains unclear whether Housing Vermont would have any continuing role in or ownership of the project after it is completed, or whether the Twin Pines Housing Trust would own as well as manage the rental units. Of the rental units, twenty-two are proposed to meet the definition of "affordable," while four are proposed to be rented at a market rate. Of the affordable units, approximately seven of the units will be rented at a low-income rate, and the remaining fifteen at a moderate income rate, depending on the requirements of the project's funding sources. The nature, parameters, and responsibilities of any association that would own and manage the common areas and open land, as provided by § 313(A)(8), has not yet been determined. Nor have Appellee-Applicants proposed any specific "legal mechanism" to manage the land reserved as private open space on the project property.

Because Appellee-Applicants are not at present requesting any density bonus or modification of setbacks or frontage under § 503 regarding affordable housing, the question of whether the project constitutes "affordable" housing only relates to the objectives and policies set forth in the Town Plan with regard to housing. The project meets both the federal and the state definitions of "affordable" housing, even though some of the units are proposed to be sold or rented at a market rate. See 24 V.S.A. §§ 4303(1), (2).

11

Questions 2, 8(a), 13(h), 13(i) and 17(e) relate to whether the proposed project meets the requirements for the management of stormwater on the project site.  Section 313(A)(5) makes it the developer's responsibility to construct any "any necessary community facilities or utilities" such as "storm . . . sewage lines."  Subsections (h) and (i) of § 313(C)(3) require the final application to contain information regarding the "existing topography and proposed final grading . . . noting areas of potential erosion, flooding, and ponding," and the "location of facilities for the control and disposal of stormwater."   Section 709(B)(5) also requires the "adequacy of surface drainage facilities" to be to be taken into consideration in site plan review.

Section 313(A)(14)(a) requires the "objectives and policies set forth in the Town Plan" to be "consider[ed]" in evaluating proposed planned developments.  Appellants argue that the proposed development is not compatible with portions of the Town Plans with respect to rivers and streams that could be affected by pollution from stormwater runoff, and that an analysis of the potential for non-point source pollution from runoff from the project should be completed.  The Town Plans state that "[n]on-point pollution sources are the greatest cause of water quality impairment." 2007 Town Plan at 69; 2001 Town Plan at 76.

The Court has already ruled, in its motion decision dated October 3, 2007, at p. 8–9, that it is not permissible for the DRB simply to require that a permittee subsequently[9] obtain any required state stormwater discharge permit, to meet the criteria in the

---

[8]    Question 2 (§ 313(A)(5));  Question 8(a) (§ 313(A)(14)(a));   Question 13(h), (i) (§ 313(C)(3)(h), (i)); Question 17(e) (§ 709(B)(5)).

[9]   Of course, any applicant is free to obtain any required state permits in advance of the municipal application, and to submit such state permits in evidence in support of the municipal application.

Regulations regarding the adequacy of drainage. Rather, the DRB, and hence this Court, must examine the currently-proposed stormwater drainage plans for the project against the requirements of the Regulations in order to rule on the present application.

The existing flow of stormwater over the project parcel is by sheet flow from the upper portions of the property roughly to the east, towards the Barr and Smith properties and Prosper Road, and thence downhill across Route 4 to an existing perennial brook leading to the Ottauquechee River. From time to time during wet conditions this runoff is a problem on the site or for the neighboring properties in the path of this sheet flow.

Prior to the current proposal for stormwater drainage, two earlier plans were considered. The current proposal was developed shortly before trial, and not all of the project plans were revised to accurately reflect the current proposal. In particular, the trees that will be required to be removed to construct the proposed drainage swale were not removed from the site plan, landscaping and lighting plan (Exhibit B), even though that plan did show other revisions made within the month prior to trial, and the bypass flow on the Fox property was not shown on the revised plans for the detention pond (Exhibit I), both as more fully discussed below.

On the project property, the current drainage proposal calls for a system of drainage lines leading to two drainage pipes, one 18" in diameter and one 24" in diameter, that will cross Route 4 to the Fox property from the southwest corner of the former Grange parcel. The central and northeasterly branches of this system conduct runoff from the developed portion (impervious area) of the property into an 18" diameter pipe which leads around the northerly and easterly sides of the Grange building. The westerly branch of this system conducts stormwater flow from the undeveloped portion of the property through the 24" pipe from a swale leading off the hillside, between proposed Buildings 9 and 10, and around the back and to the

13

southerly side of the Grange building.

The swale as now designed and shown on Exhibit H is much steeper and wider in extent than that originally planned, as it runs along the southwesterly boundary of the property, behind Buildings 6 and 7. It is designed as a ten-foot-deep cut, with as much as a 2:1 steep side slope, almost twice as steep as the existing wooded embankment. The swale must be designed to be wide enough to slow the velocity of the stormwater, so that it does not erode or scour out the bottom of the swale, and deep enough to hold the predicted volume of stormwater. Its purpose is to prevent the pre-development flow of stormwater, that had previously flowed in a sheet flow over the flat area of the property towards the east, from flowing onto the proposed development.

The soils in the area of the swale along the southwesterly boundary of the property are fine sands and silts which will be susceptible to slumping, and may be susceptible to erosion if not protected. While it is hoped that the swale can be held in place with erosion matting and vegetation, it may require reinforcement with rock, rip rap, or retaining walls. Such engineering solutions would have implications for the appearance of the project property that would have to be analyzed if they were to be proposed. Even in the present plans, retaining walls appear to be proposed between Buildings 6 and 7 and behind Building 7 to reinforce the swale, although they are not labeled as such on Exhibit H and are not shown at all on Exhibit B. If any portion of the downhill side of the swale fails or overflows, stormwater will flow onto the developed portion of project. As now proposed, construction of the swale would require the removal of trees and disturbance of the ground in a swath about 120' wide, not shown as an area in which trees are to be removed in Exhibit B. This tree removal will be discussed in Section III, below.

In order for the project to receive final approval as providing adequate drainage

14

facilities, the drainage system must be engineered and designed to demonstrate its feasibility. It is not enough, at this final approval stage, to explain that the drainage proposal has only recently been redesigned and that any problems can be adjusted during construction. While unforeseen engineering problems that develop during construction are expected to be adjusted by changes made in the field, the basic engineering of the system cannot be left to be decided in the field. Although it is possible that engineering solutions could be devised to develop an acceptable stormwater plan for the project, the current stormwater plan for the project property does not meet the requirements of §§ 313(A)(5), 313(C)(3)(h), (i), and 709(B)(5) of the Regulations and therefore cannot be approved at this time.

The project plans also do not disclose how the drainage swale and drainage line will be engineered with respect to the Burroughs and Richard Roy water lines, or whether those water lines will need to be relocated in order for the drainage system to be installed as designed. While the engineering required for the drainage system must be provided as part of the final proposed plans, any issues regarding the parties' respective rights regarding the relocation of any water lines or easements are not before this Court, although they may be addressed in the pending superior court litigation.

Earlier versions of the proposed stormwater system for the project involved retention of stormwater from the development portion of the project property on the project property, before its discharge through a culvert to the southeast side of Route 4. The present proposal would conduct that stormwater from the development portion (impervious area) of the property beneath Route 4 to a detention pond to be located on the Fox property, which would discharge or overflow to the perennial brook that is a tributary of the Ottauquechee River.

Appellee-Applicant's engineer testified that the stormwater from the upper portion of the property that is now proposed to be captured by the swale and

15

conducted across Route 4 in the 24″ pipe is not proposed to flow to the stormwater detention pond. Rather, it will bypass the pond and flow overland across the Fox property to the perennial brook. However, as of the time of trial, no channel for that flow had been designed on the Fox property; only a check dam spreader was proposed.

The October 4, 2007 revisions to the storm drain system as depicted on Exhibit 7 (Sheet C5 of the project plans) show both pipes passing separately onto the Fox property. However, although the October 15, 2007 revisions as shown on Exhibit H (also Sheet C5 of the project plans) also show the two pipes crossing Route 4 to the matchline to Sheet C6, the October 15, 2007 revisions to the detention pond design shown on Exhibit I (Sheet C6) fail to show the two separate pipes as they pass onto the Fox property. Although it is possible that engineering solutions could be devised to develop an acceptable plan for the swale stormwater to flow across the Fox parcel to the brook, in this respect the current stormwater plan for the project property does not meet the requirements of §§ 313(A)(5), 313(c)(3)(h), (i), 709(B)(5) of the Regulations and therefore cannot be approved at this time.

The detention pond is designed to receive the stormwater flow only from the developed area of the property, and to allow it to settle out before releasing the stormwater more slowly to the perennial brook. No treatment of that water is otherwise proposed or required by the Regulations. The detention pond is adequate to handle the runoff from the developed area of the property, without regard to the stormwater runoff diverted from the upper portion of the property by the swale system. An adequate buffer is provided on the Fox parcel to the perennial brook, and also to wetlands delineated on that parcel.

This brook tends to overflow in flood conditions. The stormwater flow from the project property already reaches the brook and the river, although lower down in the system than proposed in this project. Because the amount of flow from the project

16

property is small in comparison to the drainage area of the watershed, the flow after development, over the Fox parcel or after detention in the pond on the Fox parcel, would not cause any existing flooding of the Ottauquechee River or the tributary brook to be any worse than it would already be during flood conditions. However, the location at which that water reaches the brook could cause locally greater flooding at the Menotti property and on the high school property than was experienced by them from the pre-development stormwater flow. Any more specific design or redesign of the stormwater system must account for such displacement of the stormwater flow and allow those landowners the opportunity to be heard on that issue.

## II. Questions regarding harmony with adjacent land uses, placement of buildings, and landscaping and screening for those purposes[10]

Questions 1, 8(a), 8(d), 8(e), 10(a), 13(c), 13(g), 17(d), 18(b), and 18(f) relate to whether the proposed project meets the requirements for harmony with the surrounding area and adjacent uses.

Section 313(A)(1) requires the project to be "designed to create a stable and desirable environment that is in harmony with the density and type of adjacent land uses." The proposed project must not have an adverse effect on the character of the area affected by the project. § 710(A)(2).

More specifically, the Regulations require consideration of the proposed planned development's relationship to the "densities proposed for the entire area," §

---

[10] Question 1 (§ 313(A)(1)); Question 8(a) (§ 313(A)(14)(a)); Question 8(d), (e) (§ 313(A)(14)(d), (e)); Question 10(a), (b) (§ 313(B)(2)(a), (b)); Question 11(a), (b) (§ 313(B)(3)(a), (b)); Question 12(b), (d) (§ 313(B)(4)(b), (d)); Question 13(c), (g) (§ 313(C)(3)(c), (g)); Question 17(c), (d) (§ 709(B)(3), (4)); Question 18(b), (f), (g), (i), (j) (§ 710(A)(2), (7), (8), (10), (11)).

17

313(A)(14)(d), and to anything "that will contribute to the orderly and harmonious development of the land." § 313(A)(14)(e). Similarly, the proposed project must meet any specific standards in the Regulations relating to "minimum lot size," § 710(A)(7); this criterion is limited by Question 18(f) to the minimum lot size of those properties[11] intended for sale.

Section 313(B)(2)(a) states that open space should, "where feasible, serve as [a] buffer[] to adjoining land and uses." Section 313(C)(3)(g) requires the final application to contain information regarding the location of "sources of noise, odors and other potential nuisances, [and] existing buildings and structures," and § 313(C)(3)(c) requires the sketch plan to contain the "[l]ocation, size[,] and uses of the various proposed buildings." The latter criterion is limited by Question 13(c) as to whether the sketch plan contains this information with respect to which units will be owned or rented, and which will be market rate or affordable. Section 709(B)(4) requires consideration of the avoidance of glare.

Questions 12(b), 12(d), 17(c), and 18(i) relate to whether the project meets the requirements for landscaping and screening in relation to adjacent uses. Subsections (b) and (d) of §313(B)(4) allow the Court to require the "preservation, planting[,] and maintenance of trees, ground cover[,] or other vegetation, of a size and type deemed appropriate," in order to "provide privacy screening, reduce noise and glare, or to otherwise soften and/or lessen the visual impacts of development," and to "establish a barrier between incompatible land uses." Section 709(B)(3) requires consideration of the "[a]dequacy of landscaping, screening, and setbacks in regard to achieving maximum compatibility and protection of adjacent properties." The proposed project must also

---

[11]   Since the land underlying the project appears to be proposed to be held separately from the ownership of the specific units, no minimum lot size requirement can be attributed to the units slated for private sale.

meet the specific standards in the Regulations relating to landscaping and fencing. § 710(A)(10).

Questions 8(a), 10(b), 11(a), 11(b), 18(g), and 18(j) relate to whether the proposed project meets the requirements for building placement or 'clustering.' Section 313(B)(2)(b) creates a preference for locating buildings "in wooded areas or on field edges." Section 313(B)(3)(a) requires the proposed planned development to "use the least amount of area for roads and the least length of sewer, water[,] and utility lines." Under § 313(B)(3)(b), clustered developments "should be considered wherever feasible." Similarly, the proposed project must meet the specific standards in the Regulations relating to distances or setbacks from adjacent or nearby uses, § 710(A)(8), and to the design and location of structures. § 710(A)(11). The latter criterion is limited by Question 18(j) to the issue of clustering.

With respect to § 313(A)(14)(a)'s requirement that the "objectives and policies" of the Town Plan be considered, Appellants argue that the provisions of the Town Plans relating to historic preservation have not been properly considered. 2007 Town Plan at 56; 2001 Town Plan at 57-60. Specifically, Appellants argue that the proposed project will destroy the historic character of the hamlet of West Woodstock and the historic significance of two cupola twin barns on the private property northerly of the project, now visible only when the leaves are off the trees. Appellants also argue that the proposed project is not compatible with portions of the Town Plan discussing housing, which encourage higher density development in the hamlets, conversion of existing structures into multi-family housing, and new residential development that is contiguous to existing development rather than located in open spaces, even though the same section of the Town Plans discusses the need for affordable housing in Woodstock. 2007 Town Plan at 59-60; 2001 Town Plan at 66-67. Appellants argue that the proposed project does not meet the definition of "affordable housing" in § 503 of the Regulations,

19

however, the concept of affordable housing as discussed in the Town Plans is broader than the criteria in the Regulations allowing for density bonuses and other special consideration.

The project is proposed as adding fifteen new buildings clustered near existing adjacent development, on about half of an eight-acre site. The surrounding hamlet of West Woodstock is characterized by modest older homes on small lots, lining the existing roadways, with views of largely wooded hillsides above and away from the road. The project proposes a comparable density of buildings and dwelling units, keeping them largely on the flat area of the site closer to the road, and preserving the steeper hillsides as open space.

The size and scale, and the appearance of the proposed buildings is also compatible with the surrounding area; the buildings have been designed to reflect the variety of residential building design in the area. The project will not adversely affect the historic character of the area as the buildings are designed to blend well in terms of scale and design with that historic character. The concern with historic preservation in the Town Plans does not prevent new structures from being built; rather, it calls for new structures to be designed and placed so as not to detract from the historic character of an area.

The project meets the objectives and policies of the Town Plans in favor of affordable housing as a general concept. The project avoids glare from the project lighting, as the pedestrian walkways are illuminated by low bollard-style lighting and the two pole lights (one at the project entry and one in the far northerly parking lot) are down-cast lights designed to avoid glare.

The concept of arranging the project buildings around a loop road, with common space in the center, is compatible with the surrounding area, although other configurations of the buildings could also be compatible, especially as the hamlet of

20

West Woodstock is not one that is clustered around a village green, due to the way in which Route 4 cuts through the area.

However, the placement of the easterly side of the loop road and its southerly extension onto the Grange parcel, adjacent to the rear lot lines of Appellants Hirschbuhl, David Roy, and Barr, does not meet the requirements of the Regulations. Nor does the placement of Building 9 above and overlooking the Hirschbuhl property. Nor does the placement of the dumpster and recycling enclosure for the entire project behind the Grange building close to the Hirschbuhl property. In these respects the project has not been designed to achieve the maximum compatibility of the project with, and the maximum protection of, the adjacent properties.

Appellee-Applicants have not shown that the project could not have been better designed to avoid placing the project roadways, dumpster, and parking areas so close to the adjacent residential properties, such as by designing a wider buffer, community gardens, or the back-yard-equivalent spaces to be placed adjacent to those rear lot lines, as well as the fences[12] and hedges now proposed. In particular, if the dumpster and recycling enclosure is meant to serve all the units in the proposed project, it should be located so that the burden of its location falls on those who benefit from its service, not on the adjacent neighbors.

---

[12]   In addition, with respect to the assumed limitation of six feet in the height of fences designed to protect those adjacent properties, § 513(D) allows fences to be higher than six feet in connection with conditional use approval.

III.    Questions regarding open space and the protection of natural resources, including landscaping for those purposes[13]

Questions 5, 6(a), 6(b), 8(a), 8(c), 10(a), 10(b), 13(g), and 17(f) relate to the protection of natural resources and preservation of open space.[14]  In addition, Questions 12(a) and 12(c) relate to whether the project meets the requirements for landscaping and screening with respect to the protection of natural features.

Section 313(A)(14)(c) requires consideration of the proposed planned development's relationship to "the site's natural features."  Section 313(A)(9) requires proposed projects to preserve "open space, agricultural land, forested areas, significant views, streams and stream banks, steep slopes, wet areas, soils unsuitable for development, and other unique natural features."  Section 313(B)(2)(a) states that land devoted to open space should be used to "preserve agricultural, recreational[,] or natural resources."  Section 313(C)(3)(g) requires the final application for planned developments to contain information about the "[l]ocation of significant vegetation, water bodies, wetlands, [and] desirable and objectionable views."  Protection of natural resources must also be taken into consideration under § 709(B)(6).

Section 313(A)(10)(a) requires that any portion of the planned development devoted to open space "be of a size, type[,] and location to meet its intended use;" in relation to this requirement, Question 6(a) inquires as to the allocation of open space among the owned and rented units, and among the market rate and affordable rate units.  Such open space "should be contiguous to other existing or potential open space

---

[13] Question 5 (§ 313(A)(9)); Question 6(a), (b) (§ 313(A)(10)(a), (b)); Question 8(a), (c) (§ 313(A)(14)(a), (c));   Question 10(a), (b) (§ 313(B)(2)(a), (b));   Question 12(a), (c) (§ 313(B)(4)(a), (c)) Question 13(g) (§ 313(C)(3)(g)),  and Question 17(f) (§ 709(B)(6)).
[14] Question 7, regarding the use of covenants or "an appropriate legal mechanism" to protect land reserved as open space from future development, is addressed below.

areas." § 313(A)(10)(b). Section 313(B)(2)(b) states that buildings in planned developments should not be located on "sensitive areas such as wetlands, floodplains or steep slopes."

Subsections (a) and (c) of § 313(B)(4) allow the Court to require the "preservation, planting[,] and maintenance of trees, ground cover[,] or other vegetation," in order to "provide an undisturbed vegetated buffer between developed and undeveloped portions of the site to protect water quality and/or other natural features;" and to "preserve existing specimen trees, tree lines, critical wildlife habitat, or wooded areas of particular natural or aesthetic value to the site." Section 313(B)(4)(a) requires a minimum fifty-foot buffer to be established from "the delineated boundary of an identified wetland."

With respect to § 313(A)(14)(a)'s requirement that the "objectives and policies" of the Town Plan be considered, Appellants have raised several portions of the Town Plan relating to open space and protection of natural resources, and in particular the potential impact of the project and its proposed stormwater discharge system on wetlands. Both Town Plans identify numerous benefits associated with wetlands, such as providing "travel corridors and critical habitat . . . . open space . . . . recreational and educational opportunities . . . . [and] temporary storage of flood waters." 2007 Town Plan at 70-71; 2001 Town Plan at 78-80. In addition, the 2007 Town Plan refers to the "Woodstock Wetlands Inventory, Assessment & Mapping Project," completed in 2002, which "reveal[s] that due to their small size, protecting Woodstock's limited wetland resources is especially critical in maintaining clean water, hydrological integrity (equilibrium), wildlife and plant diversity." 2007 Town Plan at 71.

Neither of the wet areas on the eight-acre parcel qualifies for protection in the state wetland classification system, nor are they "identified" as wetlands on the town's wetlands maps. However, § 313(A)(9) requires the planned development proposal to

provide for the preservation of "wet areas" on the project parcel, not only to protect identified wetlands. The wet area on the southwesterly side of the parcel, associated with the old well house, is preserved in the current plans; the drainage swale is narrow in that location and passes below that wet area. The wet area on the northeastern side of the project parcel is affected by the northerly row of seven parking spaces in the parking lot proposed for that area. Those spaces will have to be eliminated or provided elsewhere on the parcel to comply with the terms of § 313(A)(9).

As currently designed, the proposed stormwater detention pond and drainage facilities on the Fox parcel are designed to maintain a 50-foot buffer from the delineated wetland, as well as from the small perennial stream. Even if the small additional area identified as wetland by Appellants' expert is included, it does not require any additional protection.

The importance of protecting open space is discussed generally in the Town Plans; of particular concern is the loss of open space along Route 4. 2007 Town Plan at 76-79; 2001 Town Plan at 83-87. The benefits of forested land, and concerns about clearing forested land for new residential development, are also discussed in both Town Plans. 2007 Town Plan at 71-73; 2001 Town Plan at 80-82. The sections of the Town Plans relating to land use also recognize a need to "establish a plan for protection of open spaces in order to provide a balanced pattern of land use and development." 2007 Town Plan at 111; 2001 Town Plan at 129. Additionally, protecting environmental resources is identified as a "crucial element[]" in the preservation of historical resources. 2007 Town Plan at 56; 2001 Town Plan at 58.

The Town Plans also identify as a problem the "inadequate number of recreational fields for athletic use," and make it an objective to "encourage the provision of an adequate number of recreational fields" in town. 2007 Town Plan at 39, 2001 Town Plan at 42. While the proposed project will remove a recreational field located

conveniently to the high school complex, the project fulfills other objectives of the Town Plans with regard to affordable housing, infill housing, clustering and open space preservation. On balance the project proposal has adequately considered the objectives and policies of the Town Plans on these topics.

The project proposal avoids construction on most of the hillside and the wooded and open upland area of the site, which is intended to remains as undisturbed open space. Other than the area to be disturbed for the drainage swale, discussed in Section I above, most of the steep slopes on the site will also not be developed.

However, the project plans on Exhibit B, which purport to show the "existing tree line to be removed," do not reflect the additional tree removal in the center of the parcel and the much larger swath of additional trees that are planned to be removed on the southwesterly hillside, to enable the construction of the drainage swale shown on Exhibit H. The wooded areas on the southwesterly hillside are of particular aesthetic importance to the site; some portion of them should be preserved if at all possible. Appellee-Applicants have not shown that a drainage plan cannot be designed that would preserve some portion of that tree line, even if it cannot preserve as much of the forested area as is shown on the project plans as being preserved. In light of Exhibit H, Exhibit B does not accurately represent the present project plans, and the project as currently proposed therefore does not meet § 313(A)(9) with respect to forested areas.

25

IV.     Questions regarding traffic, circulation, parking, and access[15]

Questions 3, 8(a), 9(b), 13(d), 13(e), 13(j), 17(a), 17(b), 18(c), 18(h), and 18(l) relate to requirements regarding circulation, parking, and access to the property, and relate to the effect of the proposed project on traffic on Route 4.

Traffic

Section 710(A)(3) requires that the project not adversely affect "[t]raffic on roads and highways in the vicinity;" § 313(A)(6) authorizes the imposition of requirements regarding traffic with regard to planned developments so as to avoid undue effects on the community.  Section 313(C)(3) requires certain information to be contained in the final planned development application, including: "[p]rincipal relationships to and impact on public services such as highways [and] town roads," § 313(C)(3)(e); and "[t]raffic and circulation analysis, including trip generation, internal circulation, ingress and egress points[,] and sight distances."  § 313(C)(3)(j).

With respect to § 313(A)(14)(a)'s requirement that the "objectives and policies" of the Town Plan be considered, Appellants argue that the proposed project will add traffic in an already congested area, citing the Town Plans' expression of concerns about traffic congestion on Route 4.  2007 Town Plan at 104, 2001 Town Plan at 122.

Route 4 carries approximately 6,200 vehicles a day, or approximately 700 in the so-called "design hour" in 2004.  The design hour is the thirtieth-highest-volume hour in the year and is used in traffic engineering and analysis.  Projected to 2012, approximately 764 vehicles can be expected to be passing by the project driveway on

---

[15]     Question 3 (§ 313(A)(6));   Question 8(a) (§ 313(A)(14)(a));   Question 9(b) (§ 313(B)(1)(b));   Question 13(d), (e), (j) (§ 313(C)(3)(d), (e), (j));   Question 17(a), (b), (§ 709(B)(1), (2)).  Question 18(c), (h), (l) (§ 710(A)(3), (9), (13)).

26

Route 4. Based on published trip generation rates for residential condominium and townhouse projects used in traffic engineering and analysis, approximately 24 or 25 vehicle trips are projected to be generated by the project to be traveling into or out of the project's access driveway onto or from Route 4 in the peak traffic hours of the day. Approximately twenty of these trips will be exiting the project access in the morning peak hour and entering the project access in the evening peak hour. The trips generated by the project will not have an appreciable effect on the traffic already traveling on Route 4, nor will the level of service at the intersection of the project driveway and Route 4 represent an unacceptable wait. The level of service for a left-hand turn into the project driveway is analyzed as rated "A" which is the least delay, while the level of service for a left-hand turn out is calculated to be rated "B," also an acceptable level of minor delay.

Appellants described the delay they already experience in exiting their driveways during a narrow period in the morning, at least from about 7:45 to 8:00 a.m., due to vehicles in the westbound lane queuing to turn at the high school entrance. Vehicles also queue to enter the high school complex during evening events at the Union Arena located in that complex. While the maximum predicted queue length at the high school is 183 feet, the queuing actually experienced by Appellants occasionally reaches 550 feet to the project driveway; however, such queue lengths are intermittent and for a sufficiently brief period so as not to impede vehicles from exiting the project driveway to turn onto Route 4, or lowering the level of service at the project driveway below an acceptable level.

Parking and on-site circulation

Section 313(B)(1)(b) mandates that off-street parking for planned developments be adequate for the proposed occupancy; in relation to this requirement, Question 9(b)

27

also asks which parking spaces are assigned to specific units. The final planned development application must include the "[g]eneral outlines of existing and proposed interior roadways, parking areas, all existing rights-of-way and easements, whether public or private, [and] location of existing utilities and infrastructure." § 313(C)(3)(d). Section 709(B)(2) requires consideration of the adequacy and safety of parking facilities and circulation. The proposed project must also meet the specific standards in the Regulations relating to "[m]inimum off-street parking . . . facilities," § 710(A)(9). Seventy-two parking spaces are required for the thirty-six proposed dwelling units. § 520(B). Eighty-six spaces are proposed in the plans before the Court, if the eight tandem spaces are included.

Nothing in the Regulations appears to require specific parking spaces to be assigned to specific dwelling units, although the buildings with accessible apartments should be assigned accessible parking spaces. The number of parking spaces and the on-site vehicular and pedestrian circulation meet the requirements of the Regulations as they are designed. However, if the layout of the proposal is redesigned to address the other considerations discussed above, regarding designing the project for maximum compatibility with and protection of the neighboring properties, and to protect the wet area in the center of the northeasterly edge of the property, any change in the configuration or the number of parking spaces, or the on-site circulation pattern, may have to be reassessed at that time.

Access and off-site circulation

Section 709(B)(1) requires consideration of "maximum safety of vehicular and pedestrian circulation between the site and street network and adjacent traffic generators." The proposed project must also meet the specific standards in the Regulations relating to "[a]ccess and circulation," § 710(A)(13), limited by Question 18(l)

as to the size of the project driveway.

With respect to § 313(A)(14)(a)'s requirement that the "objectives and policies" of the Town Plan be considered, Appellants argue that the proposed project is incompatible with the Town Plans' statements that, "Woodstock should provide continuous safe sidewalk access to allow safe passage to schools, village and commercial facilities." 2007 Town Plan at 101; 2001 Town Plan at 120. Since the sidewalks proposed for the project end at Route 4, where there are no continuous sidewalks, Appellants argue that the proposed project will create unsafe pedestrian traffic.

With regard to sidewalks, the project is well designed for on-site pedestrian circulation and pedestrian access to Route 4. Appellee-Applicants are not responsible for the lack of sidewalks on land that they neither own nor control, along Route 4.

If the two parcels have merged to a single, eight-acre parcel, then the project property has 70 feet of frontage on Route 4. Nevertheless, as the access to Route 4 does not proceed over that frontage, the access to the property must be at least 20 feet in width, and approval under § 612 is required. Regardless of whether approval is required under § 612 or under the site plan and conditional use standards, the access driveway must be adequate to provide safe circulation of vehicles, including emergency vehicles, onto and from Route 4. As designed, with a total width of 22 feet, including a two-foot-wide shoulder on each side of the 18-foot-wide, two-lane traveled way, the access driveway has adequate width for the safe passage of the project traffic, delivery vehicles, and emergency vehicles. The driveway is designed to the so-called A-76 state standards that provide an adequate turning radius from Route 4 onto the project property. Of course, any change in the width of the access road right-of-way due to the superior court litigation may require additional analysis of the adequacy of the access road.

29

At the project access driveway, Route 4 is straight and flat, that is, there are no safety constraints due to either the vertical or horizontal geometry of the roadway. There is more than a 400 foot sight distance in both directions, which is more than adequate at the posted speed limit for an oncoming driver to see a vehicle pulling out of the project driveway and to be able to stop in time, and also for a driver waiting to pull out of the project driveway to pull out into an appropriate gap in the traffic flow.

Accordingly, as designed at present, the project meets the requirements of the Regulations as to the traffic, circulation, parking, and access issues raised by Appellants; any changes to the access, the internal project roadways, or the parking on the project site may require further analysis of the on-site circulation, parking, and access road width issues.

V.     Questions regarding ownership and management responsibilities for project, and any related associations or covenants[16]

Questions 4, 6(c), 7, and 15 relate to the requirements imposed by the Regulations for future use, management, and ownership of planned developments. Section 313(C)(5) requires that the final application contain information regarding the "competence of the applicant to carry out the plan." In terms of assuring future "adequate property management and compliance with conditions of project approval," § 313(A)(8)(a) requires formation of an association if the project land will be owned by a group of individuals or corporations, and § 313(A)(8)(b) allows the Planning

---

[16]   Question 4 (§ 313(A)(8));  Question 6(c) (§ 313(A)(10)(c));  Question 7 (§ 313(A)(12)); Question 15 (§ 313(C)(5)).

Commission, and hence this Court in this de novo proceeding, to require the filing of a "Declaration of Covenants, Conditions, and Restrictions (or its equivalent)."

In discussing the land dedicated to open space, § 313(A)(10)(c) states that "[o]wnership of open space should be consistent with the best means of maintaining the resources on site," while § 313(A)(12) requires the future protection of land set aside as open space through an "appropriate legal mechanism approved by the Planning Commission," and hence by this Court in this de novo proceeding. Section 313(A)(12) requires that legal mechanism to restrict future building and removal of soil, trees, and other natural features (with certain exceptions), to provide that the project residents have access to open space at all times, and to make clear whether the open space is only for the benefit of the residents of the project, or whether it is open to the residents of Woodstock.

Housing Vermont is a non-profit tax-exempt corporation that is experienced in developing and arranging for the management of affordable rental housing throughout Vermont. Most of its projects are mixed income, having some market rate units, depending on the requirements of the various funding organizations and tax credit programs supporting the particular project. The project therefore meets the requirements of § 313(C)(5).

Section 313(A)(8)(b) does not require that the actual text of the declaration of covenants be filed at this time, although the Court can require it. However, Appellee-Applicants have not provided sufficient information in the application or in the evidence to analyze how they propose to allocate maintenance and management responsibilities among the various groups and entities owning the units, the underlying land, and/or the development rights.

The evidence does not reflect that Housing Vermont will have any continuing role in the project after it is completed. Although evidence was presented that the

ownership of (as well as the management responsibilities for) the rental units is to be transferred to Twin Pines Housing Trust, Appellee-Applicants' response memorandum only argues that it is the management that is to be conducted by Twin Pines Housing Trust. No other evidence has been provided about Twin Pines Housing Trust as an entity, or about its ability to carry out the management of the project. The boundary between the dedicated open space, the development rights for which are to be transferred to the Vermont Housing and Conservation Board, and the remaining land associated with the development and its infrastructure, has not been defined. Appellee-Applicants have not specified in any document whether the privately-owned units will be in formal condominium ownership, with a homeowners' association responsible for the building maintenance separately from that of the owner of the rental units, and have not specified whether any land area close to any of the buildings will be assigned for the exclusive use of any of the building owners or residents. Although they refer to the statutory requirement in Title 27A of the Vermont Statutes that the common ownership association is responsible for the management and maintenance of the common areas, they have not shown what areas will be considered as common areas, as distinct from the protected undeveloped "open space" area, or how building maintenance will be allocated, and in particular how the responsibility for the upkeep of the drainage system will be allocated as among the unit owners, or in connection with the land owner. Therefore the project does not meet § 313(A)(8)(a) at this time, as there was not sufficient evidence in the documents or in testimony at trial from which the Court could require a specific permit condition as to the future ownership and management responsibilities of the project.

The management of the protected 'open space' land also has not been defined, nor whether it will be open only to the project residents, open also to the residents of the hamlet of West Woodstock, or open to the residents of Woodstock as a whole.

32

Unlike the association documents referred to in § 313(A)(8)(b), an "appropriate legal mechanism" to protect the land reserved as private open space from future development and environmental damage is required to be drafted and approved in connection with the present proceedings, § 313(A)(12), even though the parties may not formally enter into it until a later date. While Appellee-Applicants presented testimony of their intention that at least a third of the property would remain as dedicated open space, with its development rights to be deeded to the Vermont Housing and Conservation Board, the area referenced[17] is not shown on any of the project plans in evidence, nor have Appellee-Applicants stated whether the "appropriate legal mechanism" will restrict the use of that land to the project residents or make it open to the residents of Woodstock. The proposal therefore also fails to meet the requirements of § 313(A)(12).

VI.     Question 17(g) relating to municipal services

Question 17(g) asks whether to proposed project meets the requirements for provision of municipal services "as to police and fire," referring to the site plan approval requirement for consideration of "[t]he provision of municipal services" under § 709(B)(7).

Based on the evidence the combined police department now serving both the Town and the Village will be able to provide any necessary police services to the

---

[17]  It is important to distinguish between the definitions of lot coverage, that is, the percentage of lot area covered by buildings, which is estimated to leave 92% of the parcel as open space (or 87% if all the paved area is included) and the "open space" permanently set aside for public or private use and not to be developed, which may be used as community open space or preserved as green space, stated as being at least a third of the project parcel as required by §313(A)(10).  §109.

project. Similarly, there is enough water and water pressure in the municipal water system to provide sufficient water for the municipal fire services. While the proposed access driveway is only approximately 22 feet in width, its outlet onto Route 4 has been designed to state standards to allow a sufficient turning radius for fire vehicles and other large service vehicles to turn into the project driveway safely. For fire purposes, other vehicles are required to stop and pull to the side, so that even if a fire truck must encroach on the opposite lane during such a turn, it can do so safely. Because there is only a single access to the property, however, if it must be redesigned due to the outcome of the Windsor Superior Court lawsuit, then the project's compliance with § 709(B)(7) as to municipal fire services will at that time have to be reassessed.

Accordingly, as designed at present, the project meets the requirements of the Regulations as to the municipal services issues raised by Appellants.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellee-Applicants have failed to carry their burden of showing that the project meets the requirements of the Town of Woodstock Zoning Regulations for planned development approval, site plan approval, and conditional use approval with respect to the specific sections discussed in this decision, and therefore final planned development approval is DENIED.

Nothing about this decision precludes Appellee-Applicant from making a future application to the Town of Woodstock DRB that addresses the reasons for which this application was denied. See 24 V.S.A. § 4470(a); In re Jolley Assocs., 2006 VT 132, ¶ 12, 181 Vt. 190 ("One change in conditions sufficient to allow for consideration of a successive application is 'when the application has been substantially changed so as to

34

respond to objections raised in the original application . . . .'" (quoting <u>In re Carrier</u>, 155 Vt. 152, 158 (1990))); <u>In re Armitage</u>, 2006 VT 113, ¶ 4, 181 Vt. 241 (Successive applications may be considered "when a revised proposal addresses all concerns that prevented approval of the prior application.").

Dated at Berlin, Vermont, this 15th day of October, 2008.

_____

Merideth Wright
Environmental Judge